Diana HECKETHORN, Plaintiff,

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

No. 3:04–cv–10017–JAJ.

United States District Court,
S.D. Iowa,
Davenport Division.

Oct. 19, 2007.

Timothy N. Tripp, Tripp, P.C., Pella, IA, for Plaintiff.

Richard L. Richards, U.S. Attorneys Office, Des Moines, IA, for Defendant.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. The court finds in favor of Plaintiff and remands for an award of benefits.

## I. *PROCEDURAL BACKGROUND*

Plaintiff Diana Heckethorn ("Plaintiff") applied for Title II Social Security benefits and Title XVI supplemental security income benefits on October 12, 1999 (Tr. 63–65) alleging an inability to work since December 30, 1998, due to multiple sclerosis. Her application was originally denied and denied again upon reconsideration. A hearing before Administrative Law Judge (ALJ) John P. Johnson was held May 8, 2002. In an opinion dated July 23, 2002, the ALJ denied benefits (Tr. 16–29). On December 19, 2003, the Appeals Council denied Plaintiff's request for review. On February 10, 2004, Plaintiff filed a complaint in United States District Court for the Southern District of Iowa.

During the appeal process, Plaintiff filed a new application for benefits on February 15, 2003, and was awarded disability benefits with an onset of disability date of July 24, 2002. After this finding, the Social Security Administration requested that the case be remanded by the Court for further review. On May 21, 2004, the District Court remanded this case to the Commissioner under sentence six of 42 U.S.C. § 405(g), for reconsideration of the time period between December 30, 1998 and

July 24, 2002 (Tr. 293–96). The Appeals Council then vacated the decision of July 23, 2002, and remanded the case to the ALJ for a new decision on November 27, 2004 (Tr. 297–98).

On July 28, 2006, the ALJ found Plaintiff "disabled" as of June 1, 2001, but "not disabled" between December 30, 1998 and June 1, 2001 (Tr. 285–292). A motion was made to reopen Plaintiff's file on November 8, 2006.

## II. *FACTUAL BACKGROUND*

At the time of the hearing before the ALJ, Plaintiff was 45 years old. Plaintiff graduated from high school. Her vocationally relevant past work experience includes work as a cashier, customer service clerk, and secretary (Tr. 165). Plaintiff alleges that she has been disabled since December 30, 1998. The ALJ found that Plaintiff had the following exertional limitations:

> [L]ifting more than 10 pounds maximum or repeatedly. She can stand 15 minutes at a time. She can walk one to two blocks at a time. She must avoid repetitive bending and repetitive stooping, kneeling, crawling, and climbing. She must avoid work requiring continuous fine manipulation for greater than 10 minutes at a time. She must avoid excessive hot and humid conditions. She should avoid work at unprotected heights or around hazardous moving machinery.

(Tr. 28).

### A. *Relevant Medical History*

Plaintiff, Diana Heckethorn, was diagnosed in 1982 by Dr. Shivapour as having "mild multiple sclerosis" ("MS"). He based his diagnosis on a lumbar puncture

and blood tests. (Tr. 169).[1]

On October 22, 1998 Dr. William Daft saw Plaintiff for muscle pain and lower back pain (Tr. 169). Plaintiff complained of bilateral leg pain and foot pain, and that it was getting worse. The doctor noted that the pain was not a radicular-type pain, but more of an ache (Tr. 169). Standing made it worse, but there was no cramping (Tr. 169). She was prescribed Naprosyn, and instructed to return in four weeks (Tr. 169).

Throughout the course of the next month, Plaintiff returned the clinic at least four additional times (Tr. 170). On October 24, Plaintiff was seen at the clinic for back and leg pain (Tr. 170). On October 30, she arrived at the clinic complaining that the previous medication was irritating her stomach, and received prescriptions for Tylenol with Codeine (Tr. 170). On November 11 and 17, 1998, the Tylenol with Codeine prescription was refilled (Tr. 170).

On November 20, 1998, Dr. Daft examined Plaintiff for continued leg and foot pain (Tr. 170). By that time, Plaintiff had been unable to walk or stand more than twenty minutes at work (Tr. 170). Plaintiff's leg pain was shooting down the back (Tr. 170). Dr. Daft noted that while Plaintiff had tenderness around the lumbar area, there was no pain in her back (Tr. 170). He further noted that x-rays taken on October 22 showed some mild degenerative disease (Tr. 170). At that point, Dr. Daft was not sure about a multiple sclerosis diagnosis (Tr. 170). A subsequent x-ray of her back, dated November 30, demonstrated nothing out of the ordinary (Tr. 178).

Upon consultation with Dr. Daft regarding a possible multiple sclerosis diagnosis, Dr. Anil Dhuna examined Plaintiff on December 29, 1998 (Tr. 186). During this examination, Dr. Dhuna noted that Plaintiff suffered from bilateral leg pain and hand paresthesias (Tr. 187). Plaintiff also had an "abnormal neurological examination with long tract findings of positive Babinski response" (Tr. 187). According to Dr. Dhuna, the diagnosis was "almost certainly Multiple Sclerosis" (Tr. 187). Dr. Dhuna arranged for a head MRI scan, a repeat visual, and brainstem evoked potentials (Tr. 188). Dr. Dhuna started a regimen of Baclofen to combat her leg pain and muscle spasms (Tr. 188). At this time, Plaintiff was already taking Vicodin (Tr. 186).

The MRI was performed on January 6, 1999. Dr. Gregory L. Day examined the images and noted:

> In the T2 weighted and FLAIR images, there are at least six lesions that exhibit increased attenuation located in the deep white matter immediately adjacent to the lateral ventricles. The largest of these, located on the left side, is about 1 cm in diameter. Most of the rest are much smaller. None of these lesions exhibit contrast enhancement with Gadolinium. This pattern suggests multiple sclerosis may be present.

(Tr. 185).

After the MRI, Plaintiff saw Dr. Dhuna for a follow up on January 12, 1999 (Tr. 184). At this visit, Dr. Dhuna confirmed that the abnormal MRI scan was "consistent with multiple sclerosis" (Tr. 184). Dr. Dhuna noted that Plaintiff was "pleasant, cooperative, alert, and oriented," with fluent speech (Tr. 184). Plaintiff's gait had also improved because of the Baclofen (Tr. 184). Dr. Dhuna attributed Plaintiff's lower leg pain to a "radiculopathy from her MS which was confirmed with an abnormal MRI scan and abnormal exam" (Tr. 184).

---

1. There is a gap in the record's medical files.

Dr. Dhuna continued Plaintiff's Baclofen and Vicodin medications, and introduced Elavil to alleviate discomfort (Tr. 184). Dr. Dhuna also suggested that Avonex injections eventually be given (Tr. 184). Dr. Dhuna also noted that he would consider a steroid treatment to alleviate the MS exacerbations (Tr. 184). At that time, Plaintiff was given a leave of absence from work (Tr. 184).

On February 15, 1999, Dr. Dhuna examined Plaintiff (Tr. 183). Dr. Dhuna recorded that the patient was depressed, had decreased eye contact, and had an abnormal gait (Tr. 183). At that point, Dr. Dhuna noted that Plaintiff had "recent significant MS exacerbations," along with general persistent lower extremity pain (Tr. 183). Plaintiff also stated that she had continued leg spasms and a "burning sensation into her buttocks and right thigh" (Tr. 183). Dr. Dhuna began an Avonex regimen (Tr. 183). By this time, Plaintiff was taking Amitriptyline, Baclofen, Relafen, and Vicodin (Tr. 183).

On April 19, 1999, Dr. Dhuna examined Plaintiff (Tr. 182). Dr. Dhuna described the patient as healthy, alert, but with an abnormal gait (Tr. 182). Dr. Dhuna also noted that the patient was doing "extremely well," working 10–11 hours per week (Tr. 182). Nevertheless, Dr. Dhuna recorded that Plaintiff had "significant fatigue and leg spasms" by late afternoon and evening (Tr. 182). Dr. Dhuna continued Plaintiff's Avonex injections at 30 micrograms weekly (Tr. 182). In addition, Dr. Dhuna switched her Amitriptyline to Desipramine (Tr. 182). The doctor also continued Plaintiff's Baclofen (Tr. 182). Dr. Dhuna stopped Plaintiff's Relafen prescription, and she was given only a limited supply of Vicodin (Tr. 182).

On August 19, 1999, Dr. Dhuna examined Plaintiff for a follow-up visit. Dr. Dhuna described the patient as "pleasant, cooperative, alert, oriented," fluent in her speech, and her extra-ocular was intact (Tr. 181). Dr. Dhuna noted that Plaintiff's MS was doing "fairly well," and was still working part-time at Target (Tr. 181). Nevertheless, despite the "fairly well" notation, Dr. Dhuna recorded that Plaintiff was suffering from increased numbness in her arms, loss of equilibrium, and burning in her legs (Tr. 181). Dr. Dhuna continued Plaintiff's Avonex injections, but also recommended increasing the dosage for Baclofen (Tr. 181).

On December 9, 1999, Dr. Dhuna examined Plaintiff at a follow-up visit. Plaintiff's main complaints were similar: fatigue, lower back spasms, leg pains, and leg weakness (Tr. 201). Dr. Dhuna noted that Plaintiff was pleasant and not depressed, but her gait was ataxic (Tr. 201). He further documented that Plaintiff's MS was stable, but she continued to suffer from spastic paresis and fatigue (Tr. 201). Dr. Dhuna continued Plaintiff's Avonex, Vicodin, Elavil, and Baclofen medications (Tr. 201).

On May 25, 2000, Dr. Dhuna examined Plaintiff at another follow-up appointment. Dr. Dhuna noted improvement of Plaintiff's muscle spasms, incontinence, and bladder dysfunction because of the medication (Tr. 200). Dr. Dhuna also noted that her gait remained abnormal despite the improvement (Tr. 200). Dr. Dhuna prescribed Amitriptyline, Baclofen, Zanaflex, Avonex, and limited supplies of Vicodin (Tr. 200).

Plaintiff was again seen on November 27, 2000 for another follow-up appointment with Dr. Dhuna. Again, Plaintiff had "marked improvement" with less stiffness, more ambulatory capacity, and less fatigue (Tr. 217). Plaintiff's main complaints were burning and discomfort of the mouth (Tr. 217). Plaintiff's gait remained abnormal,

and Dr. Dhuna continued the medication regimen (Tr. 217).

Dr. Dhuna examined Plaintiff for another follow-up appointment on June 25, 2001. Dr. Dhuna noted Plaintiff has a "relapsing remitting form" of MS, involving "muscle spasms, gait difficulty, cognitive deficits primarily memory, occasional bladder urgency, and fatigue" (Tr. 218).

### B. *Plaintiff's Subjective Complaints*

On her September 28, 1999, Disability Report, Plaintiff indicated that the "pain in [her] legs" limited the hours she could work per day (Tr. 95). The pain limited her ability to do "walk-arounds" at work, and she also became fatigued easily, limiting her work hours (Tr. 95). She stated that she became unable to work as of December 30, 1998 (Tr. 95). In response to the pain, she demoted herself from a lead cashier and took a pay and benefit cut to be transferred to a sit-down job for a few hours per day (Tr. 95). She eventually "went down to 1–2 days a week" (Tr. 95). Plaintiff also noted that her MS treatment had led to side effects from the weekly injections (Tr. 102). The side effects took the form of "flu-like" symptoms, and were severe enough to force her to take every Tuesday off from work to recover (Tr. 102).

On her October 25, 1999, Supplemental Disability Report, Plaintiff further claimed that she can no longer perform any outdoor chores, and was only able to do some indoor chores (Tr. 113). She claimed to be less active than before, and day-to-day chores take longer than they had previously (Tr. 114). She claimed she is unable to engage in any activity for extended periods of time (Tr. 116). Furthermore, since she was easily fatigued, she was limited to working 3–½ to 4 hours per day, and no more than four days a week (Tr. 114). She quit her position as a lead cashier (Tr. 116). Plaintiff notes that she has constant

aching and burning pain in her legs and feet (Tr. 115). The pain is worse in the evening (Tr. 115). Standing and walking exacerbated the pain, while hot showers and hot weather caused extreme weakness and fatigue (Tr. 115). Sitting and relaxing for a period of time assisted with alleviating pain, fatigue, and weakness (Tr. 115). Furthermore, the numbness and weakness in her hands increased the more she used them (Tr. 117). According to Plaintiff, her hands had become "extremely fumbly" (Tr. 117).

On the February 18, 2000, Personal Pain/Fatigue Questionnaire, Plaintiff further stated that her pain was constant (Tr. 134). Specifically, she also claimed that her pain is concentrated in her legs, and it was a "painful burning sensation" (Tr. 134). Pain increased in intensity throughout the day, and was the worst in the afternoon and evenings (Tr. 134). Moving and walking made the pain more severe, as did cold weather and hot showers (Tr. 134). The pain was only "somewhat" alleviated by the painkillers, and the only recourse Plaintiff had was to "stay off [her] feet" (Tr. 134). That course of action, however, was not always effective (Tr. 135). At times, her pain was so extreme that it affected her concentration (Tr. 136). The pain and fatigue made Plaintiff clumsy and unsteady, leading to cases of the "dropsies" (Tr. 136). The pain and fatigue led Plaintiff to demote herself, because of an inability to remain on her feet (Tr. 135). Plaintiff "hangs on" to her job because she wants to do "something productive as long as [she] can," despite Dr. Dhuna's suggestion that she no longer work (Tr. 135).

In August and September of 2000, Plaintiff filed another disability report (Tr. 141). In this disability report, Plaintiff noted an improvement in her ability to remember (Tr. 141), but still suffered from occasional memory issues (Tr. 147). The severity of

her memory problems fluctuated, and Plaintiff compensated by making "lots of notes to help [her] remember things" (Tr. 147). Despite the improvement in her mental capacities, Plaintiff claimed that her fine motor skills had decreased (Tr. 141). This has led to difficulty in buttoning clothes, putting on earrings, and writing (Tr. 141). By September, the numbness in her legs had increased, resulting in more stumbling, tripping, and decreased coordination (Tr. 141). Furthermore, the pain also limited Plaintiff's ability to cook and taste food (Tr. 143). Plaintiff also claims that the medication causes side effects (Tr. 144). The Zanaflex made Plaintiff very sleepy (Tr. 144). Plaintiff attempted to go to work three to four days per week (Tr. 144). Her regular activities had been negatively impacted as Plaintiff no longer crochets (Tr. 150). Rather, she was relegated to cross-stitching (Tr. 150). She also adjusted her laundry schedule, and was doing laundry throughout the week instead of larger loads once a week (Tr. 149). In addition, cleaning house has become more difficult, as Plaintiff was no longer able to do all her cleaning at once and a complete house cleaning takes an entire month (Tr. 149).

### C. *Residual Functional Capacity*

On November 20, 1999, Plaintiff was examined by Dr. Dennis A. Weis in the Iowa Disability Determination Services for a Physical Residual Functional Capacity Assessment (Tr. 191). Dr. Weis, in his report, noted that Plaintiff may occasionally lift ten pounds (Tr. 192). Plaintiff's exertional limit, however, was that she may not lift ten pounds on a frequent basis (Tr. 192). Plaintiff, furthermore, was able to stand for at least two hours in an eight hour work day, and was required to sit for six hours in an eight hour day (Tr. 192). Plaintiff also had occasional postural limitations, but was never allowed to climb

ladders, ropes, or scaffolds (Tr. 193). Dr. Weis noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations at the time (Tr. 194–95).

On September 20, 2000, Plaintiff underwent a psychiatric review by the State of Iowa (Tr. 202). Plaintiff was examined by Dr. David A. Christiansen, Ph.D. (Tr. 203). Plaintiff stated, "at one time I had trouble remembering things, short attention span, etc. That was several months ago and that cleared up. No problem there." (Tr. 203). Dr. Christiansen noted there was "no medical information in the record to support the possibility of mental impairment and the Plaintiff is not willing to pursue evaluation of mental impairment" (Tr. 203). Dr. Christiansen, therefore, concluded that the case was insufficient for mental review at that time (Tr. 203).

On November 3, 2000, Plaintiff was examined by Dr. Claude H. Koons in the Iowa Disability Determination Services for a Physical Residual Functional Capacity Assessment (Tr. 212). Dr. Koons, in his report, noted that Plaintiff was able to occasionally lift ten pounds (Tr. 205). Plaintiff's exertional limit, however, limited her to lifting five pounds on a frequent basis and ten pounds only occasionally (Tr. 205). Plaintiff was able to stand for at least two hours in an eight hour work day, and would be required to sit for six hours in an eight hour day (Tr. 192). Plaintiff also had occasional postural limitations, but was never allowed to climb ladders, ropes, or scaffolds (Tr. 193). Dr. Weis noted that Plaintiff had no manipulative, visual, or communicative limitations (Tr. 208). Plaintiff, however, was to avoid concentrated exposures to environmental extremes, noises, vibrations, hazards, fumes, odors, dusts, gases, poor ventilation, humidity, and wetness (Tr. 208). In his summary, Dr. Koons noted that Plaintiff's MS had been rather stable since May 2000 (Tr.

212). Nevertheless, Dr. Koons concluded that Plaintiff's allegations "are credible and consistent with the findings of Dr. Dhuna and the diagnosis of Multiple Sclerosis of a gradual worsening nature" (Tr. 212).

### D. *Hearing Testimony*

At the September 28, 2005, hearing, Plaintiff testified that she was 43 years old in 1998, and was a high school graduate (Tr. 480–81). In 1998, she was working for Target forty hours per week, and had been promoted to a position as high as lead cashier (Tr. 481). She testified, however, since the onset of MS symptoms in 1998, that she was unable to keep up because of the pain (Tr. 481). She was now averaging three or four days a week, with an occasional five day week at Target (Tr. 481). Plaintiff also testified to decreased job earnings since the onset of MS in 1998 (Tr. 482). She testified that the MS makes performing her job difficult, as she could potentially fall asleep due to her medication (Tr. 488). She recounted an incident where her medication caused her to be off several hundred dollars while counting money (Tr. 488). Her pain did not allow her to carry change at work (Tr. 484).

Despite the medication, Plaintiff has not been free of spasms or muscle pain since 1998 (Tr. 489). Plaintiff also testified that she was suffering from cognitive problems (Tr. 487). Plaintiff also testified when she takes the MS medication she is "almost like [she's] drunk" because she can't walk, she stumbles, she's sleepy, and she has to hang on to things to retain her balance (Tr. 492).

Prior to her job at Target, Plaintiff was employed as a secretary for a construction company (Tr. 495). She testified that she took care of payroll, answered phones, appointments, and filing (Tr. 495). Plaintiff testified that prior to her employment as a secretary for a construction company, she worked as a clerk in a convenience store (Tr. 496). That position consisted primarily of stocking groceries and running the cash register (Tr. 496).

She testified that she normally wakes up before 6:00 AM on days she has to work (Tr. 498). She would take a shower, get dressed, and go to work (Tr. 498). She usually works until 9:30 or 10:00 AM (Tr. 498). She testified that she would be so exhausted by the time she got home that she would take a nap (Tr. 485). Afterwards, she would try to fix her husband something to eat (Tr. 485). In the afternoon, depending on how she felt, she might do some household chores, watch tv, or just relax (Tr. 499). On days where Plaintiff was not working, she sleeps in until 8:00AM, but her daily schedule would be similar (Tr. 502).

The ALJ posed the following hypothetical question to the vocational expert during the hearing:

[A]n individual that during the period of time in question was between ... 42 and 46 years old, she was female, she had a high school education, she had past relevant work as you indicated in Exhibit 31E, and she had the impairment of multiple sclerosis, and as a result of that impairment, she had the residual function capacity as follows: she could not lift more than ten pounds, she could stand or walk, or stand for 15 minutes at a time, walk two to three blocks at a time, and stand or walk for two hours out of an eight hour day, sit for at least six hours in an eight hour day, with only occasional bending, stooping, squatting, kneeling, crawling or climbing. She could occasionally push or pull up to ten pounds. She could not perform continuous fine manipulation for greater than ten minutes at a time. She should not have been exposed to excessive heat or

humidity, she should not have worked at unprotected heights or around hazardous moving machinery. Would this individual have been able to perform any jobs she previously worked at, either as she performed it or as it is generally performed within the national economy? (Tr. 511–12).

The vocational expert testified that, assuming this residual functional capacity, Plaintiff could perform the cashier, money counter, and purchasing clerk jobs as normally performed (Tr. 512). The ALJ modified the hypothetical to assume:

[A]n individual of the same age, sex, education, and past relevant work and impairments as previously specified, and this would be an individual who'd have the residual functional capacity as follows: she could lift 15 to 25 pounds, routinely lift 10 pounds, with standing of a half hour at a time, sitting of a half hour at a time and walking of one to two blocks at a time, with only occasional bending, stooping, squatting or climbing, no continuous operation of, or no continuous use of hands for fine manipulation, only occasional work with the arms overhead, lifting up to five pounds. This individual could not be exposed to excessive heat or humidity or work at unprotected heights or around hazardous moving machinery, and she could perform no work requiring constant, very close attention to detail. Would this person be able to perform any jobs she previously worked at, either as she performed it or as it is generally performed within the national economy?

(Tr. 512)

Assuming this hypothetical, the vocational expert opined that the only job Plaintiff could have performed would be the purchasing clerk job (Tr. 513). The vocational expert also testified that the individual would not be able to maintain the jobs on a competitive full time basis, if she needed to take a nap, or other unscheduled breaks, during an eight hour work day (Tr. 513–14).

Plaintiff's counsel also examined the expert. Counsel asked the expert the following hypothetical, assuming:

[T]he same as the Judge's first hypothetical, but in this particular hypothetical the individual, due to her fatigue and other symptoms from the MS or her medications, would have marked fatigue and would essentially miss work two times a month on a regular basis. Would that affect your testimony to jobs identified that she could do?

(Tr. 515).

Assuming that hypothetical, the expert responded that, while employers will generally tolerate one or two absences per month, the absences in conjunction with the slower pace and marked fatigue would result in the person not being able to maintain full-time competitive employment (Tr. 515).

The attorney then modified the hypothetical to assume that the "individual was missing work three times a week" due to Avonex shots (Tr. 515). Counsel then asked whether that, along with MS symptoms, would preclude work (Tr. 515). Assuming that hypothetical, the expert testified that Plaintiff would not be able to work (Tr. 515).

Plaintiff's daughter, Amy Tobias, also testified at the hearing (Tr. 475). Ms. Tobias testified that, between 1999–2002, she lived with Plaintiff off and on several months at a time (Tr. 503). Ms. Tobias "couldn't talk to [Plaintiff] at that time because [Plaintiff] would be tired from work and hurting" (Tr. 504). Ms. Tobias also testified that she "could never tell [Plaintiff] something just once because she would forget" (Tr. 505). Ms. Tobias would

"have to remind [Plaintiff]" or otherwise call Plaintiff to remind her about appointments or other functions (Tr. 505). Ms. Tobias also testified that she "believed" Plaintiff was very depressed (Tr. 505). Plaintiff would have spells "where she would cry" and Ms. Tobias and her sister would attempt to console her (Tr. 505–06).

On May 31, 2006, another video hearing was held for the purpose of taking Dr. Dewey Ziegler, a medical expert's opinion (Tr. 524). The ALJ asked Dr. Ziegler if he had "any opinion based on a reasonable degree of medical certainty as to the appropriate diagnosis in this case" (Tr. 525). Dr. Ziegler testified that "the patient has multiple sclerosis. It's based on the fact that she has had symptoms indicating multiple areas of the central nervous system being involved and the spinal fluid should confirm this disease" (Tr. 526).

The ALJ also asked whether any of Plaintiff's medically determinable impairments, either on their own or in combination during the time period in question, "met a listed impairment or were of equal severity to a listed impairment" (Tr. 526). Dr. Ziegler testified that Plaintiff's impairments are equal to the listing for multiple sclerosis, "certainly beginning June 1, 2001" (Tr. 526). The ALJ further inquired:

> [The] treating doctor has opined that the Plaintiff had various limitations which he has now extrapolated to at least January 1999. Those limitations are as follows; lifting of less than ten pounds, standing of less than two hours out of an eight hour day and 15 minutes at a time alternating sitting and standing, with sitting of 45 minutes. But then [the treating doctor] says sitting is no, is not affected. Limited pushing and pulling with the hands and feet to less than ten pounds. Pain and fatigue markedly affecting her ability to function. Was not able to sustain six to eight hours of work, six to eight hour work day, five days a week due to pain and fatigue, and that she could never climb, kneel, crouch, crawl, stoop and only occasionally balance ... In reviewing the clinical records, and/or medical records from treating or examining sources, were there medical signs and/or laboratory studies made during that time period in question ... that supported those limitations to the extent opined? And if so, would you indicate what those medical signs or laboratory studies are located and comment on them?

(Tr. 527).

The medical expert testified that the clinical records from 1999 and 2001 "certainly document that the patient has limitations in, marked limitations in walking, some limitation in ability to lift and arm movement. And the spinal fluid they examined certainly confirms multiple sclerosis" (Tr. 527–28). The medical expert also testified that Plaintiff would be limited to occasionally lifting ten pounds and frequently five pounds (Tr. 528). Plaintiff has "marked limitations walking" and would be limited in "stooping and squatting" (Tr. 528). The medical expert also testified that Plaintiff would have environmental limitations, and should not be exposed to marked heat, unprotected heights, or hazardous machinery (Tr. 528).

At this hearing, a vocational expert also gave testimony at the May 31 hearing. The ALJ posed the following hypothetical:

> [T]he individual was 42 to 46 years old. She was a female with a high school education and past relevant work as you previously specified in ... Exhibit 31E, and she had the following impairments. She had multiple sclerosis. As a result of that impairment, she had the following residual functional capacity ... She could not lift more than ten pounds,

routinely lift five pounds, with standing of two hours out of an eight hour day, walking of one hour out of an eight hour day, sitting of at least six hours out of an eight hour day, with only occasional stooping, squatting. This individual should not be exposed to excessive heat, she should not work at unprotected heights or around hazardous moving machinery. Would this individual have been able to perform any jobs she previously worked at either as she performed it or as it is generally performed within the national economy?

(Tr. 535–36).

The vocational expert testified that, assuming this hypothetical, the individual would be able to do the cashier 1 job, the secretary job, purchasing clerk job, and the inventory clerk job as previously done (Tr. 536).

Plaintiff's attorney asked the vocational expert if "working at a slow pace one third of the time due to memory loss and fatigue" would affect the opinion the expert gave in response to the ALJ's hypothetical. The vocational expert responded:

It's been my experience that if a person is continually working at a slow pace up to a third of the time, that somebody else is having to assist them in completing their tasks, and if that's ongoing, it's generally not tolerated in a competitive setting and a person is not able to maintain full time competitive employment.

(Tr. 537).

Plaintiff's attorney posed the following hypothetical to the vocational expert:

[T]he individual would have difficulty standing more than 15 minutes, she would need to alternate sitting for 45 minutes; could only occasionally lift less than ten pounds. She has marked fatigue, pain and is unable to sustain a six to eight hour work day, five days a week due to pain and fatigue. Would such an individual be able to perform any of their past relevant work?

(Tr. 537).

Assuming this hypothetical, the vocational expert testified that the individual would not be able to perform any past relevant work or any other work on a full time competitive basis (Tr. 537).

## III. CONCLUSIONS OF LAW

### A. *Scope of Review*

In order for the court to affirm the Administrative Law Judge's ("ALJ") findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. *See Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir.1992); *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cruse*, 867 F.2d at 1184; *Taylor v. Bowen*, 805 F.2d 329, 331 (8th Cir.1986). The court must take into account evidence which fairly detracts from the ALJ's findings. *Cruse*, 867 F.2d at 1184; *Hall v. Bowen*, 830 F.2d 906, 911 (8th Cir.1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Cruse*, 867 F.2d at 1184 (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. *Gunnels v. Bowen*, 867 F.2d 1121, 1124 (8th Cir.1989); *Gavin*

*v. Heckler,* 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. *ALJ's Determination of Disability*

Determining whether a plaintiff is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The five steps are:

(1) If the plaintiff is engaged in substantial gainful activity, disability benefits are denied.

(2) If the plaintiff is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the plaintiff is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the plaintiff is prevented from performing the work she performed in the past. If the plaintiff is able to perform her previous work, she is not disabled.

(5) If the plaintiff cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1364 n. 3 (8th Cir.1990) (citing *Bowen v. Yuckert,* 482 U.S. at 140–42, 107 S.Ct. 2287); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with Plaintiff's impairments and vocational factors such as age, education and work experience. *Id.*

Under the first step of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful employment since January 1, 2001 (Tr. 288). At the second step, the ALJ determined Plaintiff had multiple sclerosis (Tr. 288). At the third step, the ALJ determined that Plaintiff's impairments were not equivalent to one of the listed impairments before June 1, 2001. It was not until June 1, 2001 when Plaintiff's impairments were equivalent to one of the listed impairments. At the fourth step, the ALJ determined Plaintiff had the residual functional capacity (RFC) to lift no more than ten pounds but could routinely lift five pounds, stand two hours in an eight hour day, walk one hour in an eight hour day, sit at least six hours in an eight hour day, and occasionally stoop and squat. She could not tolerate excessive heat, work at unprotected heights or around hazardous machinery (Tr. 288). Based on Plaintiff's RFC, the ALJ determined that, prior to June 1, 2001, Plaintiff was capable of performing past relevant work of cashier I, secretary, and purchasing clerk as actually and generally performed (Tr. 291).

### C. *Opinion of Treating Physician*

Plaintiff argues the ALJ did not give proper weight to Dr. Dhuna's January 27,

2003, retrospective opinion that Plaintiff was disabled as of January 1999. Defendant argues the ALJ properly discredited Dr. Dhuna's 2003 retrospective opinion because Dr. Dhuna's treatment notes are inconsistent. Furthermore, Defendant argues that since Dr. Dhuna's treatment notes are inconsistent, the ALJ properly considered other medical evidence in determining that Plaintiff was not disabled prior to June 2001.

■ "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001).

■ On January 27, 2003, Dr. Dhuna wrote that Plaintiff, as of January 1999, needed to periodically alternate sitting and standing to relieve pain or discomfort; she had a marked inability to function due to pain and fatigue; and she had an inability to sustain a six to eight hour work day five days a week (Tr. 438–41). The ALJ's decision to discredit Dr. Dhuna's January 2003, retrospective opinion, based on an inconsistent treatment record, was in error. Dr. Dhuna's opinion is substantiated by the medical record, and so long as the treating physician's opinion is well-supported, that doctor's opinion is to be given controlling weight. For example, just before the onset date, Plaintiff sought treatment for increased pain (Tr. 170). Symptoms date back to 1982. In 1999, Dr. Dhuna limited Plaintiff's activity to "four hours a day, four days a week" (Tr. 201). Dr. Dhuna noted that in 1998, Plaintiff was having leg pain, discomfort and muscle aches, hand problems and visual disturbance (Tr. 186). In February 1999, Dr. Dhuna noted fatigue, muscle pains, chills and aches following Avonex injections (Tr. 183). Depressive symptoms, diminished leg strength, and an abnormal gait were also noted (Tr. 183). Four months after her alleged onset, Dr. Dhuna noted arm numbness, balance problems, and burning sensation in Plaintiff's legs (Tr. 181). His treatment notes from December 1999 show continued depression, paresis, fatigue, leg pain, leg weakness and limits on work hours (Tr. 201). In May 2001, Dr. Dhuna's notes continue to support his conclusion of MS pain (Tr. 2000). By June 2001, Dr. Dhuna's treatment records report continued spasms, gait difficulty, cognitive issues, and so on (Tr. 218). Dr. Dhuna's treatment notes show consistent symptoms from 1999 until the present, and the record, as a whole, is very consistent.

The ALJ and Defendant point to inconsistencies in the clinical records, see Def.'s Br. at 9–11, note "marked improvement" and that Plaintiff was doing "much better." Def's Br. at 10. The ALJ uses these alleged "inconsistencies" in discounting Dr. Dhuna's 2003 opinion (Tr. 291), and finding that Plaintiff's condition nevertheless allowed full-time work. These statements were interpreted out of context. Stability, "marked improvement," and doing "extremely well" are relative descriptions of a patient's symptoms (Tr. 535). For example, in April 1999, Plaintiff was doing "extremely well." Yet, "extremely well" is a

relative term: Plaintiff was still suffering from fatigue and leg spasms, and was only able to work 10–11 hours a week (Tr. 182). Before April 1999, Plaintiff was suffering from depression, marked fatigue, muscle pains, along with myriad other symptoms (Tr. 183). Thus, it is obvious that a notation of "extremely well" simply meant improvement. Furthermore, even though in November 2000 Plaintiff exhibited "marked improvement," Dr. Dhuna continued to prescribe the same medicines (Tr. 217). Interpreting those terms as allowing Plaintiff to work is directly contrary to Dr. Dhuna's treatment notes as far back as 1999 (Tr. 201).

■ Evidence from the treating physician established restrictions in functional capacity that precluded performance of substantial gainful activity. This evidence was ignored by the ALJ, as the RFC presented to the vocational expert at the hearing did not include any of the restrictions (Tr. 511–13). As stated above, the ALJ erred in failing to include these restrictions. When the appropriate RFC restrictions were included in the hypothetical, the expert opined that Plaintiff "couldn't do any work on a full-time competitive basis" (Tr. 514).

The treating doctor's opinions are not inconsistent with other substantial evidence in the record. The ALJ erred in rejecting Plaintiff's treating physician's opinions that she was disabled as of December 1998.

### D. *Reversal or Remand*

The scope of a district court's review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides, in part, that:

> [t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secre-

tary, with or without remanding the cause for a rehearing.

42 U.S.C. § 506(g). The Eight Circuit Court of Appeals has stated, "[w]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." *Gavin,* 811 F.2d at 1201–02. *See also Beeler v. Bowen,* 833 F.2d 124, 127 (8th Cir.1987) (although there was no shift in the burden to the Secretary, reversal or denial of benefits was proper where "the total record overwhelmingly supports a finding of disability."); *Stephens v. Secretary of Health, Educ., & Welfare,* 603 F.2d 36, 42 (8th Cir.1979) (reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). If a remand for "further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

■ Giving Plaintiff's treating physician's opinions the proper weight, the record demonstrates that Plaintiff cannot maintain regular, sustained competitive employment. Additional hearings would merely delay receipt of benefits. Reversal for an award of benefits is proper in this case.

Upon the foregoing,

**IT IS ORDERED**

That this matter is reversed and remanded to the Commissioner of Social Security for an award of benefits as requested by Plaintiff.